IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:24CR426 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA R. GLOVER, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel, David M. Toepfer, United States Attorney, and Jennifer J. King, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States' position regarding the sentencing for Defendant, Joshua A. Glover ("Glover"). For the reasons set forth below and those to be articulated at the sentencing hearing, the United States submits that a sentence of 360 months is appropriate in this matter.

On November 14, 2024, Glover was indicted on one count of Receipt of Visual Depictions of Real Minors Engaged in Sexually Explicit Conduct in violation of 18 U.S.C. §2252(a)(2), and one count of Possession of Child Pornography in violation of 18 U.S.C. §2252A(a)(5)(B). (Indictment). Glover plead without a plea agreement to the Indictment on July 22, 2025. (R. 19: Presentence Report Investigation, PageID 3). The parties have no agreement about the sentencing range to be used or the sentence to be imposed. (Id.). On Count 1, Glover faces a statutory mandatory minimum term of imprisonment of five years up to 20 years; a fine of $250,000; supervised release for a minimum of five years up to life; and special assessments of $100, and up to $35,000. On Count 2, Glover faces a maximum term of imprisonment up to 20 years; a fine of

1

$250,000; supervised release for a minimum of five years up to life; and special assessments of $100, and up to $17,000.

According to the Presentence Investigation Report ("PSR"), Glover offense level is 43 and he is a criminal history category I. Based on these calculations, Glover's guideline imprisonment range is life (or 480 months). (R. 19: PSR, PageID 18).

## I.     FACTUAL BACKGROUND

To support its sentencing position, the United States offers the following summary of Glover's conduct. The United States also refers the Court to the factual description included in the PSR. (Id., PageID 3-11).

### A.     GLOVER IS CAUGHT USING A FAKE MODELING AGENCY TO LURE MINORS INTO TRAFFICKING CHILD PORNOGRAPHY

In June 2023, Glover's activities posing as the owner of a modeling agency to connect with minor girls online was reported to the FBI. Records from SnapChat revealed that Glover, a male in his mid-thirties, had been engaging with minors online since December 2021 in a predictable pattern that often resulted in Child Sexual Abuse Material (CSAM). Glover typically messaged female Snapchat users asking if they wanted to make money by sending photos and videos of themselves. If the user agreed, Glover would ask for their name and age and an introduction video. Often Glover asked the user to reference "Mary J Studios" in the introduction video and claimed it was his modeling company. Glover would then request additional content in exchange for monetary payment. He typically told the users that he would pay a higher sum for more sexually explicit content. Sometimes he followed through with CashApp, Venmo, or gift card payments to the users, and sometimes he did not, claiming he would need more sexual content in order to pay. Glover also asked users if they would rate the photos and videos he sent of his "models." He

evangelized his efforts and requested users to find more girls for him promising additional payment for bringing him more girls.

The prolific number of Snapchat interactions Glover engaged into receive CSAM is difficult to encapsulate in quantity or content. Glover's SnapChat return contained 18,359 individual and group chats with females believed to be 10 to 20 years old. 80 chats were identified as including a minor user in which media was either sent from or received by Glover. Due to the nature of SnapChat which does not retain many of the image or video files sent, 275 chats were identified as including a minor user but did not include the media discussed in the chat. 229 chats were identified in which media was either sent from or received by Glover, but the age of the other user(s) could not be determined. Often these files did not include the face of the user and only their naked body parts. Simply, Glover was relentless in his pursuit of young females on SnapChat.

Despite the difficulty in recovering the media files or determining the true age of the users, Glover's account contained 74 total files of CSAM (53 videos and 21 images). The returns also contained 1,581 files of Child Exploitative Material, or material that was "age difficult". The CSAM depicted victims pre-pubescent through pubescent teenagers.

Additionally, Glover's Cash App accounts were identified and subpoenaed. An analysis of the peer-to-peer transactions between Glover and multiple minors followed a pattern indicative of selling explicit content. Between December 2021 and May 2022 at least 14 transactions occurred and totaled over $500. Subject lines included statements like "either pay me or I'm gunna quit.", "callin cops if you don't pay me", and "stop sending money to a 13 year old pervert." Cash App was just one of many methods Glover used to compensate minors for their exploitive content.

3

B.   GLOVER'S CHATS REVEAL THE VARIOUS AND HEINOUS WAYS HE ENTERACTED WITH MINORS

Although no chat between Glover and a minor led to the evidence needed to charge Glover with producing CSAM, his actions clearly show he was the catalyst behind many of the CSAM files he trafficked and possessed. Specifically, Minor X, a 15-year-old female sent Glover naked photos of herself and a video of her performing oral sex on a 16-year-old male after receiving a video of Glover receiving oral sex from a "young adult." The files were not recoverable on SnapChat and the minor deleted them from her possession. In another chat with a 15-year-old, Glover discussed the minor making a video depicting oral sex between her and another male. Glover instructed her to "blow him… let him nut all over it," and then show her face in the video, and say, "here it cums maryjstudios" and "this is the real shit." This video was not recovered.

In a two year long conversation with a 16- to 17-year-old, Glover asked the minor to make sexually explicit videos of herself and send them to him. Although the videos were not recoverable, Glover and the minor often discussed payment method (gift cards, apple pay, CashApp) and the amount Glover would pay the minor for the videos. An example of one such interaction after the minor sent a video to Glover is as follows:

> Minor: they good?
> **Glover:** Yes a born slut. I love you girls. You got to let me fuck for money soon
> Minor: Yea soon
> **Glover:** Do you like sluting out
> Minor: yea
> **Glover:** Explain to me what a positive of being a slut
> **Glover:** Make it like a paragraph and explain for girls who are new wanting to join

Glover tried to persuade the minor to involve her 15-year-old sister and any additional "girls" to make sexually explicit videos. Additionally, Glover continuously asked the victim to meet him in person so he could pay her for oral sex. Evidenced in the chat, Glover appeared to drive to a

4

location to meet the minor to engage in sexual acts; however, the defendant became nervous and left the area instead of meeting with the minor. Portions of the chats are included in the PSR and give a sampling of the lewd nature and language Glover engaged in daily with minors. (R. 19: PSR, PageID 3-9).

      C.      THE SEARCH WARRANT AND INTERVIEWS CONFIRM GLOVER SOUGHT CSAM FROM MINORS ONLINE

On April 3, 2024, a federal search warrant was executed at Glover's residence in Elyria, Ohio. Glover's iPhone was seized and analyzed. It contained 26 total files of CSAM (seven videos and 19 images) and included CSAM depicting toddlers. Of the CSAM recovered through Glover's SnapChat and iPhone, not one file was a known series of child pornography.

Glover was interviewed and stated he used Snapchat to talk to family members and non-family members, namely minors who he exchanges photos and texts. Glover admitted he asked minors to produce nude and sexually explicit photos and videos for him which he recorded and saved in his Snapchat account. Glover said "Mary J Studios" is a modeling company he created and used to role play with underage girls so they would send him images and videos. He admitted to using CashApp and ApplePay to send money to minors for "role play things." Glover confirmed he likes girls 12-15 years old and admitted some of the minors he spoke to and received images from were under 16 years old. Glover estimated receiving sexual videos/images from approximately 90 girls beginning in either 2021 or 2022. Glover would ask the minors to send the videos and he would sometimes pay for the videos that he would use for his own sexual gratification.

Glover failed the polygraph. In the post-test interview, Glover explained when he was 21-years-old, he was in a sexual relationship with a 16 year old whom he engaged in sex with on at least two occasions.

5

## II. APPLICABLE LEGAL STANDARDS

### A. LEGAL PRECEDENT FOR GUIDELINE SENTENCE

The United States requests a sentence of for Glover of 360 months, consistent with the law and research highlighting the danger posed by child pornography offenders. Numerous courts have emphatically expressed the wretched consequences of child pornography. For example, the court in United States v. Cunningham, 680 F.Supp.2d 844 (N.D. Ohio 2010), noted:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.
> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions.
> Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.[1]

In United States v. Goff, the Third Circuit made note of the traumatic impact child pornography offenses have on the victims, contrary to the sentiment of some courts that believe the offense is "just pictures." [2] The court stated:

> Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography. These small victims may rank as anyone else in [defendant]'s mind, but they do indeed exist outside his mind. Their injuries and the taking of their innocence are far too real. There is nothing casual or theoretical about the scars they will bear from being abused for [defendant]'s advantage.

---

[1] Id.
[2] 501 F.3d 250, 258-59 (3rd Cir. 2007).

The defendant in another case, United States v. MacEwan, tried to downplay his receipt of child pornography by claiming that he was not a violent offender or a trafficker of guns or drugs.[3] The Third Circuit was not persuaded, reasoning as follows:

> Congress found that where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years.
> Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.
> Furthermore, it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.[4]

In United States v. Norris, the defendant claimed that children depicted in child pornography are not victimized by receipt.[5] Rather, the defendant claimed that the victimization occurred solely when the child pornography was produced.[6] The Fifth Circuit thoroughly repudiated that argument as follows:

> Norris takes an unrealistically narrow view of the scope of harms experienced by the child victims of the child pornography industry. Unfortunately, the victimization of the children involved does not end when the pornographer's camera is put away. The consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in these materials to suffer as a result of his actions in at least three ways.

---

[3] 445 F.3d 237, 249-50 (3rd Cir.2006).
[4] Id. (citations omitted); see also United States v. Duhon, 440 F.3d 711, 718-20 (5th Cir. 2006); United States v. Yuknavich, 419 F.3d 1302, 1310 (11th Cir. 2005); United States v. Grosenheider, 200 F.3d 321, 332-34 (5th Cir. 2000).
[5] United States v. Norris, 159 F.3d 926, 929-30 (5th Cir. 1998), *cert. denied*, 526 U.S. 1010 (1999).
[6] Id.

*First*, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials. [T]he materials produced are a permanent record of the children's participation and *the harm to the child is exacerbated by their circulation*. . . . The consumer who merely or passively receives or possesses child pornography directly contributes to this continuing victimization.

*Second*, the mere existence of child pornography represents an invasion of the privacy of the child depicted. Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent . . . The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.

*Third*, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials. As Congress put it in explicit factual findings:

[T]he existence of and traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles and child pornographers, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Plainly, Congress has described a chicken-and-egg scenario in which it would be impossible to determine whether child pornographers or consumers of child pornography were initially responsible for the creation of the child pornography industry. The underlying point, however, is that there is no sense in distinguishing, as Norris has done, between the producers and consumers of child pornography. Neither could exist without the other. The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued production of child pornography, which entails continuous direct abuse and victimization of child subjects.[7]

---

[7] Norris, 159 F.3d at 929-31 (emphasis in original) (citations omitted).

These children often live with the knowledge that there are numerous, unknown individuals in the world who are sexually gratifying themselves with pictures of the worst moments of the children's lives, and that such exploitation will continue indefinitely.[8] In New York v. Ferber, the U.S. Supreme Court noted: [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.[9]

Consumers of child pornography such as Glover also create a market and demand for the production of these images and videos, which depict the sexual abuse and exploitation of real children. These consumers therefore contribute to the cycle of abuse and are in part responsible for the harm suffered by children used to produce the images and videos in their collections.[10] In United States v. Goldberg, the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].[11]

---

[8] See United States v. Blinkinsop, 606 F.3d 1110, 1118 (9th Cir. 2010) (finding that "[t]he children involved in pictorial and cinematic pornography additionally endure ongoing harm because their images have been preserved in a permanent medium").
[9] 458 U.S. 747, 759 n.10 (1982), quoting Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981).
[10] See United States v. Goff, 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography").
[11] 491 F.3d 668, 672 (7th Cir. 2007).

Thus, even if consumers of child pornography do not themselves molest children, their actions contribute to the abuse of children.

### III. SENTENCING GUIDELINES COMPUTATION

The government has no objections to the computation found by the PSR writer and defense has made no objections to the enhancements and calculation of a "life" guideline. (R. 19: PSR, PageID 18, 27).

### IV. APPLICATION OF § 3553(A) FACTORS

#### A. NATURE AND CIRCUMSTANCES OF THE OFFENSE

Glover did not causally engage on a peer-to-peer network with like-minded users to obtain regularly trafficked CSAM. Instead, he engaged with children directly online. He groomed them by first posing as a modeling agency and gradually building a relationship until he could obtain pornographic images from them. Glover did not trade this CSAM with other adults but used it for his own sexual gratification and to persuade children to make similar pornography. Glover's SnapChat return showed he manipulated and exploited over 40 minors, most of whom law enforcement was unable to identify. By his own admission, Glover estimated receiving sexual videos or images from approximately 90 girls. Glover is more than just a casual observer who happened to obtain child pornography while seeking legal pornography. He is an online predator.

#### B. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Glover grew up in Northeast Ohio with "good" relationships with his family and was free of any physical or sexual abuse. (Id., PageID 15). He successfully battled childhood Leukemia and obtained a high school diploma. (Id., PageID 15-16). Before his arrest, he worked 10 years for the same company building furnaces and water tanks. (Id.). He still maintains a relationship with his sister and receives her support in this case.

10

Glover denied any addictions to illicit drugs, but did seek mental health treatment after a conviction for Operating a Vehicle Intoxicated in 2014. (Id., PageID 16).

      C.      NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST PUNISHMENT

In Bistline, the Sixth Circuit noted a reasonable sentence must reflect the seriousness of the offense or provide for any general or specific deterrence.[12] Congress has plainly indicated "[e]very instance of viewing images of child pornography represents a . . . repetition of their abuse."[13] The words of Congress and many courts echo the victims themselves. For many victims, the downloading of images is just as traumatic as the initial act of abuse. These victims express embarrassment of being depicted in these extremely vulnerable situations. They also express fear of being watched and subsequently recognized by people like Simmers who fixate on videos and images of them.

Glover committed child exploitation offenses in the comfort and privacy of his own home, and he alone is responsible for his actions and the impact they have had on the children depicted in the videos and images he trafficked and possessed. He alone obtained child pornography, shared child pornography–mostly with minors, and saved the perverse material to his phone.

---

[12] See United States v. Bistline, 665 F.3d 767-68 (6th Cir. 2012).
[13] 18 U.S.C. § 2251 (Historical and Statutory Notes: Child Pornography Prevention of 2006, Pub. L. No. 109-248, Title V, § 501, July 27, 2006, 120 Stat. 587, 623 (2006)).

D. NEED FOR SENTENCE TO AFFORD ADEQUATE DETERRENCE

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence.[14] In United States v. Goldberg,[15] the court opined:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded, consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

In fact, the Bistline Court reversed a district court that failed to see any importance in general deterrence.[16] The district court stated, "general deterrence . . . will have little [if] anything to do with this particular case."[17] The Sixth Circuit found "that [the district court's] statement is

---

[14] United States v. Irey, 612 F.3d 1160, 1206 (citing New York v. Ferber, 458 U.S. 747, 760 (1982)) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); Osbourne v. Ohio, 495 U.S. 103, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand); United States v. Goff, 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); United States v. Barevich, 445 F.3d 956, 959 (7th Cir. 2006) (The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it. Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children.).
[15] 491 F.3d 668, 672 (7th Cir. 2007).
[16] See Bistline, at 767.
[17] Id.

12

inexplicable, and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'"[18]

Even though Glover and others who have an overwhelming interest in the sexual assault of young children may not be deterred even if the sentence for the crimes was life, it is also true that others would certainly not be deterred if Glover received a sentence less than 360 months. These offenders do talk to each other via the Internet, and they are concerned enough about law enforcement that they encrypt their hard drives, seek foreign websites, and use anonymous phone apps in an effort to prevent detection. There is much to be gained by a significant sentence—increased safety for our children.

V. **MONETARY PENALTIES**

    A. FINE

The PSR report finds that Glover does not have the ability to pay a fine in this case. (R. 19: PSR, PageID 18). The government agrees.

    B. 18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Glover is not subject to a mandatory $5,000 Additional Special Assessment under 18 U.S.C. § 3014 for each count of conviction due to the lapse in appropriations.

The *Amy, Vicky, and Andy Child Pornography Victim Assistance Act* of 2018 (AVAA), enacted on December 7, 2018, made a number of changes to existing child pornography laws, specifically with regard to restitution. Specifically, the law: (1) provides that restitution must be ordered for all "child pornography trafficking offenses" of no less than $3,000 per victim; (2) imposes a new special assessment for those defendants who are convicted of certain child

---

[18] Id. *(*citing United States v. Camiscione, 591 F.3d 823, 834 (6th Cir. 2010)).

pornography related offenses; (3) permits victims of child pornography trafficking offenses to seek a one-time payment of $35,000 from a reserve fund; (4) amends the definition of "sexually explicit conduct" under 18 U.S.C. § 2256(2); and (5) adds 18 U.S.C. § 3509(m)(3), which allows victims, their attorneys, and any purported expert to access a victim's own sexually explicit images during any criminal proceeding. Of particular importance in this case is the provision that Glover could be ordered to pay up to $35,000 for the trafficking offense in Count 1. The government defers to the Court regarding an additional AVVA assessment.

## VI. CONCLUSION

For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that this Court impose a sentence within the sentencing guideline range.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

By: /s/ Jennifer J. King
Jennifer J. King (OH: 0089375)
Assistant U.S. Attorney
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Tel. No. (216) 622-3759
E-mail: Jennifer.King@usdoj.gov

14